# Charles B. Calvert and Geo. H. Calvert, *vs.* Richard Williams.

An act of the Legislature, authorising a court of equity, upon the application or petition of the defendant in a *certain cause*, and "upon the establishment of a *satisfactory prima facie case*, to open any decree or order" which had been passed against him in said cause, to the end that he "may account fully, fairly and equitably for the estate" which had been under his management, and for a settlement of which the suit was instituted, "*provided* the said court shall be satisfied that justice will be promoted by opening such decree or order, and provided it be opened upon such terms," as to costs, the nature of the defences to be relied on, the taking of testimony, &c., "as to the court may seem consistent with equity, it being the design of this act to remove any legal impediment to the granting of such application and to afford the defendant such redress, upon the principles of justice and equity, as he may show himself entitled to, when relieved from the operation of any technical or rigid rule of law," is *constitutional*.

This act does not impose on the court, as a duty, *primarily* to decide whether

or not the defendant will be able *ultimately* to make out his defences, but only that he shall exhibit a *satisfactory prima facie case.*

APPEAL from the Equity Side of the Circuit Court for Montgomery county.

The bill in this case was filed in the court of chancery, on the 3rd of June 1850, by the appellants, as administrators *de bonis non* of Thomas Cramphin, and as executors and residuary devisees and legatees of George Calvert, who had been the administrator of Cramphin, and *trustee,* under certain conveyances, executed by agreement, in order to terminate the litigation respecting the will of Cramphin, against the appellee and others, *cestui que trusts* under these conveyances and specific legatees of Cramphin, and the heirs at law of George Calvert.

The object of the bill was to settle up and distribute the entire estate of Cramphin, real and personal, under the direction of the court of chancery. The appellee, Williams, had been, pending the litigation respecting Cramphin's will, appointed administrator *ad colligendum,* and afterwards administrator *pendente lite* of the personal estate of Cramphin; and the bill charges that he has not delivered over all the assets to the regular administrator, but yet retains many parcels of the estate, with the rents, profits and increase thereof, of great value, unaccounted for; and prays that he may account for all the property and effects of Cramphin, and the rents, issues and profits thereof, which came, or might have come, into his hands, as such collector and administrator; and that he may discover whether certain specific legacies, which he claims to have delivered and paid to certain legatees of the name of Williams, have been delivered or satisfied, or now remain due. Such are the allegations and prayers of the bill, so far as the appellee is concerned. Other matters, numerous and complicated, in reference to the settlement of this large estate, are involved in the bill, but need not be stated.

Some of the defendants being non-residents, an order of publication was passed, and on the 9th of August 1850, a *subpœna* was issued, returnable at the following September term of the chancery court, against the defendant Richard Williams, and

others, of Montgomery county, which was returned by the sheriff *"non sunt."* The process was then renewed to December term 1850, and again returned *"non sunt."* It was then renewed to March term 1851, and returned, *"Summoned Richard Williams* and *non sunt* the rest,"* at which term, viz: on the 15th of April 1851, an *interlocutory decree* was passed against Richard Williams for *failing to appear,* and on the 9th of July following, an ex-parte commission to take testimony was issued to Frederick Pinkney of the city of Baltimore, under which the testimony was taken, in that city, of witnesses residing in Montgomery county, to sustain the allegations of the bill against Williams, and duly returned on the 10th of May 1852. On the 9th of July 1852, the answers of the defendants, belonging to the Cramphin family, having been previously filed, a commission-in-chief was, by agreement between the counsel for that family and the counsel for the complainants, issued to Frank H. Stockett, of the city of Annapolis, under which testimony, consisting of documentary evidence, was taken in that city and returned on the following day. The object of this testimony was to affect the Cramphins.

On the 31st of May 1853, the complainants dismissed their bill against the other defendants of the name of Williams, and submitted the cause to the chancellor for a decree, and on the same day a decree was passed, directing, among other things, Richard Williams and Charles B. Calvert, to account as to all matters relative to the estate of Cramphin, of which they *ought respectively to account,* in order that a final settlement of the estate may be made; and referring the case to the auditor "to take such accounts from the pleadings and proofs now in the cause, and such other proof, if any, as the parties may produce before him, on giving the usual notice." Notice directed, "To the parties in this cause," of the time and place of taking the audit, was sent by the auditor to the solicitor for the complainants, with request to have it served on the opposite parties, and was returned, "service admitted," by the complainants' solicitor, and the solicitor for the defendants, "other than Williams and his family." And on the 12th of July

1853, the auditor made his report, accompanied by account A, in which Williams is charged with the sum of $28,510.59, with interest on part thereof, as due by him to the estate of Cramphin, and on the 28th of July 1853, the chancellor passed a decree, ratifying and confirming this account, with the exception of a certain sum credited to Williams, which is left the subject of further directions, and directing Williams forthwith to pay, or bring into court to be paid, to the complainant Charles B. Calvert, as administrator *de bonis non* of Cramphin, the sum of $28,510.59, with interest as stated in the account. On this decree a writ of *fieri facias* upon application of Calvert, was ordered to be issued on the 15th of November 1853, but it does not appear that it was ever issued.

On the 17th of February 1854, Williams filed a petition, praying, that the enrolment of this decree may be opened, and that he may have relief upon simple order on this petition, by leave to file a bill of review, or by such other mode of redress as his case may require, and for general relief. In this petition he admits that the *subpœna,* returnable to March term 1851, was duly served upon him, but to excuse his non-appearance, he avers, that from the inception of this suit until some time in the latter part of January 1854, he was in utter ignorance, in fact, of its institution, and had not the most remote idea that it was in progress against him, and that the decree has been obtained against him by surprise and mistake, and through no wilful default or neglect on his part; *that* the day after the *subpœna* was served on him he went to Rockville to consult counsel, and inquire into the nature of the suit, and called on Richard I. Bowie, Esq., who had long been his counsel, and told him that a chancery summons had been served on him, the purport of which he did not understand, to which Mr. Bowie promptly replied: "Give yourself no uneasiness about it, it is a mere matter of form and has been issued in a case filed by me for Duffy, to validate his deed; I will put in your answer, or at all events, attend to it for you;" and that relying upon this assurance, and feeling no interest in Duffy's suit, though aware he might be a necessary party to it under Cramphin's will, and believing that he had

done all that was required of him, he returned home and dismissed the matter from his mind. In further explanation of his conduct, and that of his counsel, he avers, that at the time this bill was filed there were pending, and had been for many years, two suits by Calvert against him, the one in the orphans court, and the other in the county court of Montgomery county, to accomplish the same object precisely, so far as he is concerned, as is sought by this bill; *that* he has always been ready and anxious to account, and hoping from time to time to do so finally, either in the orphans court, or in the suit in the county court, has had his papers and vouchers from time to time, and for years at a time, in Rockville, at one time in the hands of the auditor of the county court, and at others in the hands of his counsel, to be used, as occasion required, in the orphans court, or before the arbitrators to whom the suit at law was, in one stage of its prolonged existence, referred; but he has ever been prevented from accounting by circumstances beyond his control, and has acted at all times under the advice of counsel; *that* Mr. Bowie was and is his counsel in the above mentioned suit in the county court, and the fact of his expecting the petitioner's accounts to be settled at Rockville, in one or the other of the above suits, precluded him from entertaining the idea that another suit had been instituted, and strengthened his conviction that the summons aforesaid had been issued in Duffey's suit, or rather prevented the suspicion even of any other case, from entering his mind. These facts are urged in support of the allegation of surprise, and as other facts tending to the same result, the issuing of the commissions to distant and remote places, although the witnesses resided in Montgomery county, the irregularity in issuing and executing the commission to Annapolis, the failure of the auditor to give notice to the petitioner of the time and place of taking the account, are stated. He then avers that he has paid away property in the discharge of the duties imposed upon him as collector and administrator *pendente lite,* and during his management of the estate, of, at least, $30,000, for nearly all of which he has now written receipts and vouchers, and for not one dollar of which has he received credit; that he has kept

accurate and detailed accounts of his receipts and disbursements, and has held himself ready at all times to account; and that upon a full and fair accounting it will be ascertained that he is not indebted to the estate at all; that he now produces an answer ready to be filed, setting out his case upon its merits, waiving all technical defences, accompanied by vouchers to the number of nearly six hundred in support of the credits claimed.

This petition, under oath, was set down for hearing on the 2nd of March 1854, and on the 4th of that month, Calvert filed his answer thereto, in which he insists, that the decree was regularly recovered, according to the course of the court, without fraud on his part or any one else, and without surprise on the petitioner, and he therefore relies on the decree, as a bar to all relief prayed in the petition. The particular allegations of this answer, so far as necessary to be stated, will be found in the opinion of the court below, hereinafter set out. On the 9th of the same month, the proceedings were, upon the application of Williams, removed to the circuit court for Montgomery county, and on the 10th, the following act of Assembly, of 1854, ch. 160, was passed, entitled: "An act for the relief of Richard Williams of Montgomery county."

"*Whereas,* it hath been represented to the General Assembly of Maryland, that a decree, by default, has been passed by the court of chancery, in a case in which Charles B. Calvert and George H. Calvert are complainants, and Richard Williams and others, are defendants, requiring payment by said Williams, of a large sum of money, and that such decree has been obtained, by reason of a misapprehension and mistake on the part of Williams, and of the counsel to whom he applied in the case, and in the absence of wilful neglect or laches; *and whereas,* it hath been represented, that the execution of said decree would operate gross injustice, inasmuch as Williams is alleged to be entitled to credit for payments and just allowances, sufficient in his view to show an indebtedness to him from the estate, for an account of which said suit was instituted, of the benefit of which credit he has been deprived, under circumstances entitling his case to the favorable consideration of the Legislature; *and whereas,* an application has been

made to the court of chancery, for opening the said decree, and allowing a full and fair accounting by him, and it is feared that under existing laws, the court cannot grant the said application, or administer such relief as it is believed the case demands: Therefore,

"SECTION 1. *Be it enacted by the General Assembly of Maryland.* That any court to which the case, aforesaid, may be removed according to law, be, and it is hereby authorised, upon any application or petition now filed, or hereafter to be filed, and upon the establishment of a satisfactory *prima facie* case, to open any decree or order heretofore passed in said case, to the ends that said Williams may account fully, fairly and equitably, for the estate real and personal, of Thomas Cramphin deceased, formerly under his care and management; *Provided,* the said court shall be satisfied, that justice will be promoted by opening such decree or order; *and provided,* it be opened upon such terms as to the payment of costs, the nature of the defences to be relied upon, the taking of testimony, and the time within which it is to be returned, and the prevention of an alienation, in the meanwhile, of any property now held by said Williams, as to the court may seem consistent with equity; it being the design of this act to remove any legal impediment, to the granting of the prayer of said Williams' petition, and to afford him such redress upon the principles of justice and equity, as he may show himself entitled to, when relieved from the operation of any technical or rigid rule of law. .

"SECTION 2. *And be it enacted,* That said court in its discretion, may stay execution upon said decree, until said application shall be heard and adjudicated, and either party shall have the right to an appeal, from any order or decree to be passed upon the said petition or application; and in the event of an appeal, this act shall apply to the Court of Appeals, in like manner, and to the same extent as it is designed to apply to the court aforesaid.

"SECTION 3. *And be it enacted,* That this act shall take effect from the day of its passage."

On the 30th of May 1854, Calvert applied for a *fieri facias*

upon the decree, to which application, Williams, on the same day, filed an answer, under oath, in which he repeats the allegations of his petition to open the decree, refers to and relies upon the act of Assembly, above stated, sets out various proceedings in the case, in the orphans court of Montgomery county, above mentioned, copies of which are filed with his answer, in support of the averment, that he has always been willing and ready to account, and prays that execution of the decree may be stayed, until his former application for an opportunity to answer the bill, and for the establishment of a satisfactory *prima facie* case to open the decree and account, shall be adjudicated. Upon this application and answer, the court, on the 25th of August 1854, passed an order authorising the parties to take testimony before a justice of the peace, upon six days' notice, or under a commission, in reference to the satisfactory *prima facie* case, contemplated by the act of 1854, ch. 160, and requiring Williams to convey all his property to a trustee, in trust for the payment of any sum which he may be decreed to pay in this suit.

Under this order, testimony was taken on both sides, the purport of which sufficiently appears from the following opinion of the court below, (BREWER, J.,) delivered upon the passage of the order appealed from.

"This case comes before the court upon a petition to open a decree of the chancery court, passed in the chancery court, and transmitted to this court under the constitution and act of Assembly in pursuance thereof. The decree was founded on an interlocutory decree, under the act of 1820, ch. 161, and *ex-parte* testimony and auditor's accounts. The defendant was summoned to appear, and the interlocutory decree was for want of appearance. The final and interlocutory decrees are now sought to be opened on the grounds of mistake by the defendant and *surprise upon him*, and under the apprehension that the court, although it might be disposed to open the decree, for the purpose of letting in the merits of the case, could not do so according to the practice of the court, an act of the Legislature, was passed at the session of 1854, ch. 160, authorising the court on any application or petition, and on the

establishment of a satisfactory *prima facie* case, to open the said decrees, provided the court shall be satisfied, that justice will be promoted by opening said decrees.

"This act of Assembly is said to be unconstitutional, in consequence of the assumption therein of judicial power. The point has been fully argued, and many cases referred to in support of it, but it is not necessary to make any particular reference to them, inasmuch as, in the opinion of the court, it has been fully settled by the decisions of the courts of Maryland. 3 *H. & J.*, 43, *Gover vs. Hall.* 1 *G. & J.*, 463, *Crane vs. Meginnis.* 12 *Do.*, 286, *Prout vs. Berry.* This case comes within the established principles of those cases. The act determines no right of the defendant petitioner, and affects no right of the complainant or any other person; nor does it deprive the complainant of any evidence or proceeding in the case, or subject him to any disadvantage. On the contrary, it provides, that the court shall be satisfied, that justice will be promoted by opening such decree, and espe cially stating the design of the act to be, to remove any legal impediments to opening the decree, and to afford the petitioner such redress upon the principles of justice and equity, as he may show himself entitled to, and gives to the court full power to annex such equitable conditions to its order, as will remedy every inconvenience to which the complainant might otherwise be subjected to by it.

"This act authorises the court to open the decree, 'upon the establishment by the petitioner of a satisfactory *prima facie* case.' Does it mean a *prima facie* case, as to the rights of the petitioner, which may be fully determined after the opening the decree, or a *prima facie* case, as to the propriety of opening the decree? I think the latter, because the act further provides, that the court shall also be satisfied, that justice will be promoted by opening such decree. It is not altogether clear what the Legislature meant by a *prima facie* case. If they used the words in a technical sense, it would seem to be sufficient for the petitioner to establish a satisfactory case, upon his own evidence, without reference to contradictory facts, adduced on the part of the complainant. But a

contrary course has been pursued. The complainant has taken testimony, which he claims to be considered both on this point and that arising under the other proviso in the act. The Legislature, I presume, from the recitals in the act, did not expect the court, in forming its opinion, to be governed by principles differing very materially from those by which it is ordinarily governed, in applications to its discretion in cases of this kind. It seems, however, to require, not only the establishment of the fact, that the case had not been decided upon its merits, but that sufficient merits exist, to promote justice by opening the decree. It also seems to require, that there should have been an absence of wilful neglect or *laches*, on the part of the petitioner and his counsel, and a misapprehension and mistake on their parts.

"I am compelled to believe, that justice would be promoted by opening this decree. The complainant, in his answer to the petition, admits it is 'highly probable,' that payments to a large amount have been made by the petitioner, for which he has not been credited, though he qualifies this admission by the statement of his belief, that the petitioner received large sums, for which he had not been charged by the auditor, and his suspicions, that he is indebted to him in as large a sum, at least, as has been recovered against him. The complainant seems to think, that the account is erroneous, but that by surcharges and omitted credits, the balance against the defendant would be about the same. The petitioner, therefore, if the decree should stand, would be charged more upon conjecture than a just accounting.

"If the mistake or misapprehension, and the absence of wilful neglect or laches, is to be shown by evidence, other than the petitioner's own oath, and the opening of the decree depended on that alone, he could hardly obtain relief. The *subpœna* would seem to be to him, (if he read it,) well aware as he was of the character of his business connexion with the Calverts, and his litigation with them, a sufficient indication of the nature of the proceeding, to afford him strong inducement to give to its commands his speedy attention, of which there appears to be no other evidence than his own oath. The tes-

timony of the counsel to whom he applied, was easily accessible to him, and it is difficult to conceive why it was not taken, more especially as the complainant had stated in his answer, 'that he had been informed and believed, that the counsel denied that any such conversations were had by him with the said petitioner, as in said petition is pretended, and that he was therefore advised to insist, that if any reliance was to be placed on such conversations, that the counsel should be regularly examined, touching the same.' His statement ought to have been exhibited in some form to the court, or its absence accounted for, and the omission to do so must induce the court to look upon the petitioner's statement with less confidence. In the case of *Burch vs. Scott*, 1 *G. & J.*, 393, there was no regular examination of the counsel. The court acted on his affidavit filed with the petition. The affidavit of the petitioner alone, however, might be sufficient to establish the *prima facie* case referred to in the act. Supported as it is by the probabilities of the case, I think it is sufficient. Unless he had held the conversation with his counsel as stated, after having seen the *subpœna*, having so large an interest at stake he would hardly have rested satisfied. His conduct was consistent, and only consistent with the assurances given him. Moreover, it does not appear, that ever after the service of the *subpœna*, he had the least intimation of the pendency of a suit in chancery against him. On the contrary, the subsequent proceedings were calculated to keep him in the dark. The testimony was all taken in places remote from his residence, and no notice or intimation of them appears to have been given to him by the complainants, or have otherwise come to his knowledge. The suit in Montgomery, embracing the same subject, was still pending, and the counsel in that case on both sides, resided in that county. He might, therefore, very reasonably have supposed, that they would have given him information of any other proceedings in reference to it.

"'The charge of fraud or surprise, is not substantiated. I do not see any evidence of a studious concealment of the proceedings in chancery by the complainant. His counsel seems

rather to indicate that, tired of the protracted litigation in the circuit and orphans courts, which he attributed to the defendant's unwillingness to come to a fair settlement, he was determined to press it in another tribunal, leaving it to the defendant to take care of himself. For this purpose he dismissed, as against the other defendants, his bill, which was originally intended to place the whole accountability of himself as well as Williams, and the disposition of the whole estate, under the direction of the court of chancery, and proceeded to recover from Williams the amount which he supposed him to owe, intending to run the risk of the disposition of the whole estate in the ordinary manner.

"But the petitioner has, I think, legally established a satisfactory *prima facie* case, that there was no wilful neglect or laches on his part. Independent of the particular provisions of the act of Assembly, I think there would have been sufficient ground for opening this decree. The case of *Burch vs. Scott*, 1 *G. & J.*, 393, is the leading case on this subject, and is, if I may be permitted such a remark, of a decision of the eminent gentlemen, then constituting the Court of Appeals, rather a hard case. But the laches there were much greater than they are here. A *subpœna* and injunction were served on the defendant to September term 1823, and not appearing, an attachment was returned *"attached"* to March term 1824, and an order to take the bill *pro confesso* served on him in May 1824, making four distinct notifications of the filing of the bill, and that the complainant was pressing it to a conclusion. The defendant however attempted to lay the whole blame on his counsel, from whose neglect suitors have sometimes been relieved. But the answer seems eventually to have been prepared and sworn to in time to prevent a decree if it had been filed, but the defendant, to save postage or the expense and time necessary to carry it himself, left it to his counsel to send it by the stage; to counsel whose business is not to carry papers for their clients, and who, when eminent as his counsel was, are apt to become careless in such matters. There too the case was not so complicated, nor the injury so great as it might be here. The chancellor however opened

the decree, but the Court of Appeals reversed his decision, and in their opinion, they say, "that after being repeatedly in contempt by his disregarding the solemn process of the court, the complainant makes his present application with an ill grace." They further say that there is no general and positive rule on the subject; that Lord Thurlow observed in one case, that if a defendant comes in after a bill has been taken *pro confesso,* upon any reasonable ground of indulgence, and pays costs, this court will attend to his application if the delay has not been extravagantly long. This, the judge says, makes the case to depend on which side the greatest inconvenience would lie. If granted, he says, the complainant might gain an advantage which he had lost by his own repeated contumacy and gross negligence; and on the other hand, instead of a regular and speedy administration of justice by a prompt and respectful attention to the process and jurisdiction of the court, they will be disregarded and disobeyed. In this case the petitioner cannot be charged with repeated contumacy or gross negligence. The latter part of the judge's remarks are very indefinite, and are considered not to be particularly applicable to this case. The complainant was delayed here for a considerable part of the time by other defendants not connected with the petitioner, during which no process had been served upon him, and might still have been delayed by them if he had not abandoned the original object of his bill and dismissed it as to them."

"It is thereupon this 24th day of July 1855, adjudged, ordered and decreed, that the decree of April 15th, 1851, and the subsequent decrees of May 31st, 1853, and July 28th, 1853, be, and they are hereby, opened and rescinded, and the petitioner is hereby authorised and permitted to file an answer to the original bill, and to take any testimony in reference to the charges against him or his defense, to the end that the said petitioner may account fully, fairly and equitably for the estate, real and personal, of Thomas Cramphin, deceased, formerly under his care and management. It is further adjudged, ordered and decreed, that the said petitioner shall pay to the complainant all the costs of this suit incurred by him up to the present time, and shall not plead limitations

or lapse of time or any dilatory plea, or make any defense not applying exclusively to the merits of this case; and that he shall file his answer or plea, on or before the first day of September next, and his testimony shall be taken and returned to this court, on or before the first day of November next, unless the time shall be further extended by order of this court, and the case stand for hearing at the next November term, unless the time shall be extended by further order. It is further adjudged, ordered and decreed, that the complainant shall have the benefit of all the testimony taken heretofore by him in any form, and of all the papers heretofore filed or exhibited by him as evidence, in so far as the same would be legal evidence in the cause if filed regularly, or returned in the proper manner. It is further adjudged and ordered, that the conveyance executed and filed, under the order of August 25th, 1854, shall stand as if required also by this order, and that no alienation of the property therein included shall be made by the grantors or grantee in said deed; and the said Williams is hereby prohibited and enjoined from aliening any part of any property in his possession.''

From this decree the complainants appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*Lloyd W. Williams* and *Thos. S. Alexander* for the appellant, argued :

1st. That Williams has not entitled himself, according to the *general principles* of the court in such cases, to open the decrees complained of. These decrees were regularly entered, and he has offered no proof whatever in impeachment of Calvert's conduct, or in extenuation of his own culpable negligence. The case of *Scott vs. Burch,* 1 *G. & J.,* 393, is the leading case in this State upon the question, when and how a final decree can be opened or attacked, and conclusively decides that it cannot be done upon such an application as this.

2nd. That the special act of Assembly on which the application is based, directs the court to open the decrees on proof

by Williams of *a satisfactory prima facie* case; that is to say, upon a case to be stated by Williams, and on proof to be submitted by him, without regard to any rebutting evidence which could or might be offered by Calvert in support of the decrees. This rule of judicature, adopted for this *special case*, is, as we insist, against *natural justice*, which secures to a party impleaded in any matter the privilege of self-defence.

3rd. But if it is argued that the Legislature did not intend to deprive Calvert of the privilege of rebutting the case which Williams should attempt to make, by averment or evidence on his part, then we insist, that a *satisfactory prima facie case*, in this sense, is nothing more than *probable cause* in the usual acceptation of this court, and that Williams has failed to show *probable cause* against the decrees, since upon the entire record the decrees were the results of his own inexcusable negligence and contempt of the authority of the court, and since he has thought proper to suppress the evidence in his possession, that is to say, the evidence of his *receipts*, without which it cannot be shown that any substantial wrong will be done him by the enforcement of the decrees.

4th. That if the act of 1854, ch. 160, affects to confer upon Williams a right to open the decrees complained of in any other manner, or upon any other terms, or for any other cause, than would govern the action of the court in like cases between other suitors, it is unconstitutional and void. It is denied that the Legislature can, at its pleasure, deprive the citizen of his right to execution of a decree recovered in a court of competent jurisdiction, according to the course of that court and the law of the land. It is denied that the Legislature can prescribe for the discussion and determination of the right of an individual citizen involved in a particular cause, a special rule of judicature unknown to the law of the land, and different from the rule which would be applied to the discussion and determination of like issues, between other suiters. 3 *H. & J.*, 43, *Gover vs. Hall.* 12 *G. & J.*, 286, *Prout vs. Berry,* and same case in 2 *Gill,* 147. 8 *Gill,* 145, *Miller vs. Fiery.* Dec. of Rights, Articles 6, 21. 2 *Md. Rep.*, 452, *Wright vs. Wright.* 15 *Penn. State Rep.*, 18, *De Chas-*

*tellux vs. Fairchild.* 2 *Barr,* 277, *Norris vs. Clymer.* 3 *Greenleaf's Rep.,* 326, *Lewis vs. Webb.* 4 *Do.,* 140, *Durham vs. Lewiston.* 2 *Chipman,* 77, *Bates vs. Kimball.* 1 *New Hamp.,* 199, *Merrill vs. Sherburne.* 11 *Mass.,* 396, *Holden vs. James.* 9 *G. & J.,* 409, 412, *Regents, &c., vs. Williams.* 1 *Md. Ch. Dec.,* 252, *Harness vs. Ches. & Ohio Canal Co.* 1 *Bl. Com.,* 44.

5th. The decree appealed from is clearly erroneous in overruling the former decrees absolutely, as it thereby avoids acts done in execution of the decrees affecting the interests of other parties, and materially delays and impedes the administration of justice as between those other parties in matters in which Williams has no concern. It is conceded this part of the decree is warranted by the act, but that the act should contemplate such an unmitigated wrong and oppression only strengthens the argument against its constitutionality.

*A. B. Hagner* and *Alex. Randall* for the appellee, argued:

1st. That, independent of the act of Assembly, there were, according to the general principles and practice of courts of equity, sufficient grounds for opening this decree, upon the petition of Williams, because it was obtained against him on the ground of his having failed to appear, when such failure was caused by mistake and surprise, and through ignorance of the service of the summons, he intending no contempt of the court, and never actually believing he had been served with this process. In support of the power and jurisdiction of the court so to act in such a case, they cited 11 *G. & J.,* 137, 426, *Oliver vs. Palmer & Hamilton.* 9 *Md. Rep.,* 67, *Contee vs. Pratt.* 2 *Madd. Ch. Pr.,* 467. 2 *Smith's Ch. Pr.,* 14. 1 *Ves., Sen.,* 205, *Kemp vs. Squire. Ibid.,* 326, *Wright vs. Wright.* 1 *Dickens,* 62, *Robson vs. Cranwell. Ibid.,* 109, *Kinsay vs. Kinsay. Ibid.,* 109, *Hankwitz vs. Ocarre. Ambler,* 92, *Cunyngham vs. Cunyngham.* 3 *Merivale,* 698, *Attorney General vs. Brooke.* 2 *Daniel's Ch. Pr.,* 1230, 1231, 1232. 1 *G. & J.,* 393, *Scott vs. Burch.* 1 *Md. Ch. Dec.,* 20, *Barry vs. Barry. Ibid.,* 455, *Pfeltz vs. Pfeltz.* 2 *Do.,* 292, *Hughes vs. Jones.* 6 *Munf.,* 267, *Erwin vs.*

*Vint.* 11 *Eng. Cond. Ch. Rep.*, 101, *Stevens vs. Guppey.* 1 *Craig. & Phillips*, 361, *Booth vs. Creswicke.* 7 *Eng. Law & Eq. Rep.*, 14, *Hargrave vs. Hargrave.* 1 *Johns. Ch. Rep.*, 200, *Radley, et al., vs. Shaver, et al.* 3 *Do.*, 424, *Lansing vs. McPherson. Ibid.*, 415, *Beekman vs. Peck.* 1 *Do.*, 539, *Wooster vs. Woodhull.* 8 *Paige*, 176, *Tripp vs. Vincent.* 7 *Do.*, 509, *Millspaugh vs. McBride.* 11 *Geo. Rep.*, 654, *Carter vs. Torrance.* 1 *Drury & Warren*, 72, 74, *Enraght vs. Fitzgerald.* 7 *Eng. Law & Eq. Rep.*, 216, *Morgan vs. Morgan.* 2 *De Gex Macn. & Gordon*, 28, *Turner vs. Turner.* 11 *Irish Eq. Rep.*, 125, *Murray vs. Byrne.*

2nd. That the order opening this decree was correct, also because the decree is against the equity and merits of the cause, even as shown by the complainants' allegations and proofs, and because it was obtained against the rules and practice of the court of chancery, the proper notice from the auditor not having been given, and because it is not a *final* decree, but simply an interlocutory decree, or a decree to account. To sustain these views, they cited 6 *G. & J.*, 204, *Evans vs. Iglehart. Alex. Ch. Pr.*, 122, 124, 127. 2 *Madd. Ch. Pr.*, 463. 1 *Drury & Welsh*, 255, *Jackson vs. Welsh.*

3rd. But if it should be supposed that there existed any technical or other objection to the opening of this decree, it is removed by the act of Assembly of 1854, ch. 160, which, as we insist, is *constitutional* and valid. 2 *Gill*, 150, *Prout vs. Berry.* 7 *Do.*, 321, *Day vs. The State.* 9 *Do.*, 309, *Baugher vs. Nelson.* 12 *G. & J.*, 400, *State vs. Balto. & Ohio Rail Road Co.* 3 *H. & J.*, 43, *Gover vs. Hall.* 2 *Md. Rep.*, 450, *Wright vs. Wright.* 3 *Dallas*, 386, *Calder vs. Bull.* 8 *Pet.*, 88, *Watson vs. Mercer.* 16 *Do.*, 59, *Watkins vs. Holman.* 10 *How.*, 396, *Balto. & Susq. Rail Road Co. vs. Nesbit.* 3 *Scammon*, 465, *Edwards vs. Pope.* 4 *Munroe*, 94, *Kirby vs. Chitwood.* 6 *Do.*, 592, *Shehan vs. Barnett. Smith's Com.*, 500. 2 *Pet.*, 660, *Wilkinson vs. Leland.*

Le Grand, C. J., delivered the opinion of this court.

We have given to this case much reflection, and think we should affirm the action of the judge below, and, so far as the act of 1854, ch. 160, is concerned, for the reasons assigned by him. In addition to the authorities cited in his opinion, we refer to the case of *Prout vs. Berry*, 2 *Gill*, 147, and to the case of *Baugher, et al., vs. Nelson*, 9 *Gill*, 299.

Whilst we affirm the decision of the circuit court, we wish to be understood as doing so only in deference to past decisions in regard to such acts as that of 1854, ch. 160. Were we called upon for the first time to pronounce on the constitutionality of such legislation, we would not hesitate to decide against it, but we do not feel at liberty to do so when the past history of our jurisprudence shows our impressions have not been shared by those who have gone before us. Conceding, then, the constitutionality of the act of 1854, we do not entertain any doubt that a *"satisfactory prima facie"* case has been shown for the opening of the decree. The appellee claims payments to the estate of Cramphin of many thousands of dollars, the vouchers of which he avows a readiness to produce when required to do so. The act of Assembly does not impose upon the court, as a duty, primarily to decide, whether or no, the appellee will be able, ultimately, to make out his defences, but only that he shall exhibit a *"satisfactory prima facie"* case, and this we think he has done.

*Decree affirmed, but without costs in this court.*